JUL 17 2025 am9:47
FILED - USDC - FLMD - ORL

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 6:25-cr-

KYLE BLAKE KOTECHA

## PLEA AGREEMENT

Pursuant to Fed. R. Crim. P. 11(c), the United States of America, by Gregory W. Kehoe, United States Attorney for the Middle District of Florida, and the defendant, KYLE BLAKE KOTECHA, and the attorney for the defendant, Andrew C. Searle, mutually agree as follows:

**A.    Particularized Terms**

1.    Count(s) Pleading To

The defendant shall enter a plea of guilty to Count One of the Information.  Count One charges the defendant with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371.

2.    Maximum Penalties

Count One carries a maximum sentence of five years' imprisonment, a fine of $250,000, a term of supervised release of not more than three years, and a special assessment of $100 per felony count for individuals, and $400 per felony count for persons other than individuals, such as corporations.  With respect to certain

1

Defendant's Initials _KK_

offenses, the Court shall order the defendant to make restitution to any victim of the offense(s), and with respect to other offenses, the Court may order the defendant to make restitution to any victim of the offense(s), or to the community, as set forth below.

3.    Elements of the Offense(s)

The defendant acknowledges understanding the nature and elements of the offense(s) with which defendant has been charged and to which defendant is pleading guilty.  The elements of Count One are:

First:    two or more persons, in some way agreed to try to accomplish a common and unlawful plan to commit wire fraud, in violation of 18 U.S.C. § 1343, as charged in the information;

Second:    the defendant knew the unlawful purpose of the plan and willfully joined in it;

Third:    during the conspiracy, one of the conspirators knowingly engaged in at least one overt act as described in the information; and

Fourth:    the overt act was committed at or about the time alleged and with the purpose of carrying out or accomplishing some object of the conspiracy.

The elements of wire fraud are:

First:    the defendant knowingly devised or participated in a scheme to defraud, or to obtain money or property by using false pretenses, representations, or promises;

Second:    the false pretenses, representations, or promises were about a material fact;

Third:    the defendant acted with the intent to defraud; and

2

Defendant's Initials  _KK_

Fourth:    the defendant transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud.

4.    <u>Indictment Waiver</u>

Defendant will waive the right to be charged by way of indictment before a federal grand jury.

5.    <u>No Further Charges</u>

If the Court accepts this plea agreement, the United States Attorney's Office for the Middle District of Florida agrees not to charge defendant with committing any other federal criminal offenses known to the United States Attorney's Office at the time of the execution of this agreement, related to the conduct giving rise to this plea agreement.

6.    <u>Mandatory Restitution to Victim of Offense of Conviction</u>

Pursuant to 18 U.S.C. § 18 U.S.C. §§ 3663(a) and (b) and 3663A(a) and (b), defendant agrees to make full restitution to any identified victims of the conspiracy charged in Count One of the Information.

7.    <u>Guidelines Sentence</u>

Pursuant to Fed. R. Crim. P. 11(c)(1)(B), the United States will recommend to the Court that the defendant be sentenced within the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines, as adjusted by any departure the United States has agreed to

3

Defendant's Initials  _KK_

recommend in this plea agreement. The parties understand that such a recommendation is not binding on the Court and that, if it is not accepted by this Court, neither the United States nor the defendant will be allowed to withdraw from the plea agreement, and the defendant will not be allowed to withdraw from the plea of guilty.

    8.    <u>Acceptance of Responsibility - Three Levels</u>

        At the time of sentencing, and in the event that no adverse information is received suggesting such a recommendation to be unwarranted, the United States will recommend to the Court that the defendant receive a two-level downward adjustment for acceptance of responsibility, pursuant to USSG § 3E1.1(a). The defendant understands that this recommendation or request is not binding on the Court, and if not accepted by the Court, the defendant will not be allowed to withdraw from the plea.

        Further, at the time of sentencing, if the defendant's offense level prior to operation of subsection (a) is level 16 or greater, and if the defendant complies with the provisions of USSG § 3E1.1(b) and all terms of this Plea Agreement, including but not limited to, the timely submission of the financial affidavit referenced in Paragraph B.5., the United States agrees to file a motion pursuant to USSG § 3E1.1(b) for a downward adjustment of one additional level. The defendant understands that the determination as to whether the defendant has qualified for a downward adjustment

4

Defendant's Initials   _KK_

of a third level for acceptance of responsibility rests solely with the United States Attorney for the Middle District of Florida, and the defendant agrees that the defendant cannot and will not challenge that determination, whether by appeal, collateral attack, or otherwise.

9.    Cooperation - Substantial Assistance

The defendant agrees to cooperate fully with the United States in the investigation and prosecution of other persons, and to testify fully and truth-fully before any and all federal grand juries and at any trials or other proceedings in connection with any of the cases, charges, or matters noted herein, and any related cases. The defendant further agrees to be reasonably available for all interviews which the United States may require. The defendant further agrees to make full and complete disclosure of all relevant information, including production of any and all books, papers, documents, and other objects in the defendant's possession or control.

The defendant understands and agrees that the United States will not file a motion at the time of sentencing recommending a downward departure from the applicable guideline range pursuant to USSG § 5K1.1, or subsequent to sentencing, pursuant to Fed. R. Crim. P. 35(b), for the defendant's cooperation unless the defendant testifies at trial in connection with any of the cases, charges, or matters noted herein, and any related cases.

5

Defendant's Initials  _KK_

10.     <u>Use of Information - Section 1B1.8</u>

       Pursuant to USSG §1B1.8(a), the United States agrees that no self-incriminating information which the defendant may provide during the course of defendant's cooperation and pursuant to this agreement shall be used in determining the applicable sentencing guideline range, subject to the restrictions and limitations set forth in USSG §1B1.8(b).

11.     <u>Cooperation - Responsibilities of Parties</u>

      a.     The government will make known to the Court and other relevant authorities the nature and extent of defendant's cooperation and any other mitigating circumstances indicative of the defendant's rehabilitative intent by assuming the fundamental civic duty of reporting crime. However, the defendant understands that the government can make no representation that the Court will impose a lesser sentence solely on account of, or in consideration of, such cooperation.

      b.     It is understood that should the defendant knowingly provide incomplete or untruthful testimony, statements, or information pursuant to this agreement, or should the defendant falsely implicate or incriminate any person, or should the defendant fail to voluntarily and unreservedly disclose and provide full, complete, truthful, and honest knowledge, information, and cooperation regarding any of the matters noted herein, the following conditions shall apply:

6

(1)    The defendant may be prosecuted for any perjury or false declarations, if any, committed while testifying pursuant to this agreement, or for obstruction of justice.

(2)    The United States may prosecute the defendant for the charges which are to be dismissed pursuant to this agreement, if any, and may either seek reinstatement of or refile such charges and prosecute the defendant thereon in the event such charges have been dismissed pursuant to this agreement.  With regard to such charges, if any, which have been dismissed, the defendant, being fully aware of the nature of all such charges now pending in the instant case, and being further aware of defendant's rights, as to all felony charges pending in such cases (those offenses punishable by imprisonment for a term of over one year), to not be held to answer to said felony charges unless on a presentment or indictment of a grand jury, and further being aware that all such felony charges in the instant case have heretofore properly been returned by the indictment of a grand jury, does hereby agree to reinstatement of such charges by recission of any order dismissing them or, alternatively, does hereby waive, in open court, prosecution by indictment and consents that the United States may proceed by information instead of by indictment with regard to any felony charges which may be dismissed in the instant case, pursuant to this plea agreement, and the defendant further agrees to waive the statute of limitations and any speedy trial claims on such charges.

7

Defendant's Initials _KK_

(3)    The United States may prosecute the defendant for any offenses set forth herein, if any, the prosecution of which in accordance with this agreement, the United States agrees to forego, and the defendant agrees to waive the statute of limitations and any speedy trial claims as to any such offenses.

(4)    The government may use against the defendant the defendant's own admissions and statements and the information and books, papers, documents, and objects that the defendant has furnished in the course of the defendant's cooperation with the government.

(5)    The defendant will not be permitted to withdraw the guilty pleas to those counts to which defendant hereby agrees to plead in the instant case but, in that event, defendant will be entitled to the sentencing limitations, if any, set forth in this plea agreement, with regard to those counts to which the defendant has pled; or in the alternative, at the option of the United States, the United States may move the Court to declare this entire plea agreement null and void.

12.    <u>Forfeiture of Assets</u>

The defendant agrees to forfeit to the United States immediately and voluntarily any and all assets and property, or portions thereof, subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), whether in the possession or control of the United States, the defendant or defendant's nominees. The assets to be forfeited specifically include, but are not limited to, the $3,965,264.35

8

Defendant's Initials _KK_

in proceeds the defendant admits he obtained as the result of his participation in the conspiracy to which the defendant is pleading guilty, as well as

    a. Approximately $4,953.89 seized from Wells Fargo Bank Account #5277099734 held in the name of Established Investments, Inc.;[1]

    b. Approximately $248,160.82 seized from Wells Fargo Bank Account #1010310175889 held in the name of Kyle Kotecha;

    c. Approximately $568,162.65 seized from Bank of America Account #898130334353 held in the name of The Reskill Network, Inc.;[2] and

    d. Approximately $250,869.25 seized from Bank of America Account #898132432295 held in the name of KKSKK Real Estate Holdings, LLC,[3]

which funds constitute proceeds the defendant obtained from his participation in the conspiracy. The net proceeds from the forfeiture and sale of any specific assets will be credited to and reduce the amount the United States shall be entitled to forfeit as substitute assets pursuant to 21 U.S.C. § 853(p).

    The defendant acknowledges and agrees that (1) the defendant obtained $3,965,264.35 as a result of the commission of the conspiracy and (2) as a result of the acts and omissions of the defendant, the proceeds not recovered by the United States through the forfeiture of the directly traceable assets listed herein have been

---

[1]  The defendant agrees to the forfeiture of these funds individually and as the President and sole officer/director of Established Investments, Inc.

[2]  The defendant agrees to the forfeiture of these funds individually and as the President and sole officer/director of The Reskill Network, Inc.

[3]  The defendant agrees to the forfeiture of these funds individually and as the President and sole officer/director of KKSKK Real Estate Holdings

9

Defendant's Initials  _KK_

transferred to third parties and cannot be located by the United States upon the exercise of due diligence. Therefore, the defendant agrees that, pursuant to 21 U.S.C. § 853(p), the United States is entitled to forfeit any other property of the defendant (substitute assets), up to the amount of proceeds the defendant obtained, as the result of the offense(s) of conviction and, further, the defendant consents to, and agrees not to oppose, any motion for substitute assets filed by the United States up to the amount of proceeds obtained from commission of the offense(s) and consents to the entry of the forfeiture order into the Treasury Offset Program.

The defendant additionally agrees that since some of the criminal proceeds have been transferred to third parties and cannot be located by the United States upon the exercise of due diligence, the preliminary and final orders of forfeiture should authorize the United States Attorney's Office to conduct discovery (including depositions, interrogatories, requests for production of documents, and the issuance of subpoenas), pursuant to Rule 32.2(b)(3) of the Federal Rules of Criminal Procedure, to help identify, locate, and forfeit substitute assets.

The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, judicial or administrative forfeiture action. The defendant also agrees to waive all constitutional, statutory and procedural challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the

Defendant's Initials _KK_

forfeiture described herein constitutes an excessive fine, was not properly noticed in the charging instrument, addressed by the Court at the time of the guilty plea, announced at sentencing, or incorporated into the judgment.

The defendant admits and agrees that the conduct described in the Factual Basis below provides a sufficient factual and statutory basis for the forfeiture of the property sought by the government. Pursuant to Rule 32.2(b)(4), the defendant agrees that the preliminary order of forfeiture will satisfy the notice requirement and will be final as to the defendant at the time it is entered. In the event the forfeiture is omitted from the judgment, the defendant agrees that the forfeiture order may be incorporated into the written judgment at any time pursuant to Rule 36.

The defendant agrees to take all steps necessary to identify and locate all property subject to forfeiture (including substitute assets) and to transfer custody of such property to the United States before the defendant's sentencing. To that end, the defendant agrees to make a full and complete disclosure of all assets over which defendant exercises control, including all assets held by nominees, to execute any documents requested by the United States to obtain from any other parties by lawful means any records of assets owned by the defendant, and to consent to the release of the defendant's tax returns for the previous five years. The defendant agrees to be interviewed by the government, prior to and after sentencing, regarding such assets and their connection to criminal conduct. The defendant further agrees to be

11

Defendant's Initials  _KK_

polygraphed on the issue of assets, if it is deemed necessary by the United States. The defendant agrees that Federal Rule of Criminal Procedure 11 and USSG § 1B1.8 will not protect from forfeiture assets disclosed by the defendant as part of the defendant's cooperation.

The defendant agrees to take all steps necessary to assist the government in obtaining clear title to the forfeitable assets before the defendant's sentencing. In addition to providing full and complete information about forfeitable assets, these steps include, but are not limited to, the surrender of title, the signing of a consent decree of forfeiture, and signing of any other documents necessary to effectuate such transfers.

The defendant agrees that, in the event the Court determines that the defendant has breached this section of the Plea Agreement, the defendant may be found ineligible for a reduction in the Guidelines calculation for acceptance of responsibility and substantial assistance, and may be eligible for an obstruction of justice enhancement.

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon the defendant in addition to forfeiture.

The defendant agrees that the forfeiture provisions of this plea agreement are intended to, and will, survive the defendant, notwithstanding the abatement of any

Defendant's Initials _KK_

underlying criminal conviction after the execution of this agreement. The forfeitability of any particular property pursuant to this agreement shall be determined as if the defendant had survived, and that determination shall be binding upon defendant's heirs, successors and assigns until the agreed forfeiture, including the forfeiture of any substitute assets, is final.

**B.** **Standard Terms and Conditions**

    1.    Restitution, Special Assessment and Fine

The defendant understands and agrees that the Court, in addition to or in lieu of any other penalty, shall order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663A, for all offenses described in 18 U.S.C. § 3663A(c)(1); and the Court may order the defendant to make restitution to any victim of the offense(s), pursuant to 18 U.S.C. § 3663, including restitution as to all counts charged, whether or not the defendant enters a plea of guilty to such counts, and whether or not such counts are dismissed pursuant to this agreement. The defendant further understands that compliance with any restitution payment plan imposed by the Court in no way precludes the United States from simultaneously pursuing other statutory remedies for collecting restitution (28 U.S.C. § 3003(b)(2)), including, but not limited to, garnishment and execution, pursuant to the Mandatory Victims Restitution Act, in order to ensure that the defendant's restitution obligation is satisfied.

Defendant's Initials _KK_

On each count to which a plea of guilty is entered, the Court shall impose a special assessment pursuant to 18 U.S.C. § 3013. To ensure that this obligation is satisfied, the Defendant agrees to deliver a cashier's check, certified check, or money order to the Clerk of the Court in the amount of $100.00 payable to "Clerk, U.S. District Court" within ten days of the change of plea hearing. The defendant understands that this agreement imposes no limitation as to fine.

2.    Supervised Release

The defendant understands that the offense(s) to which the defendant is pleading provide(s) for imposition of a term of supervised release upon release from imprisonment, and that, if the defendant should violate the conditions of release, the defendant would be subject to a further term of imprisonment.

3.    Immigration Consequences of Pleading Guilty

The defendant has been advised and understands that, upon conviction, a defendant who is not a United States citizen may be removed from the United States, denied citizenship, and denied admission to the United States in the future.

4.    Sentencing Information

The United States reserves its right and obligation to report to the Court and the United States Probation Office all information concerning the background, character, and conduct of the defendant, to provide relevant factual information, including the totality of the defendant's criminal activities, if any, not limited to the

14

Defendant's Initials  _KK_

count(s) to which defendant pleads, to respond to comments made by the defendant or defendant's counsel, and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject to any limitations set forth herein, if any.

    5.   <u>Financial Disclosures</u>

        Pursuant to 18 U.S.C. § 3664(d)(3) and Fed. R. Crim. P. 32(d)(2)(A)(ii), the defendant agrees to complete and submit to the United States Attorney's Office within 30 days of execution of this agreement an affidavit reflecting the defendant's financial condition. The defendant promises that his financial statement and disclosures will be complete, accurate and truthful and will include all assets in which he has any interest or over which the defendant exercises control, directly or indirectly, including those held by a spouse, dependent, nominee or other third party. The defendant further agrees to execute any documents requested by the United States needed to obtain from any third parties any records of assets owned by the defendant, directly or through a nominee, and, by the execution of this Plea Agreement, consents to the release of the defendant's tax returns for the previous five years. The defendant similarly agrees and authorizes the United States Attorney's Office to provide to, and obtain from, the United States Probation Office, the financial affidavit, any of the defendant's federal, state, and local tax returns, bank records and any other financial information concerning the defendant, for the purpose

Defendant's Initials   _KK_

of making any recommendations to the Court and for collecting any assessments, fines, restitution, or forfeiture ordered by the Court. The defendant expressly authorizes the United States Attorney's Office to obtain current credit reports in order to evaluate the defendant's ability to satisfy any financial obligation imposed by the Court.

6.    <u>Sentencing Recommendations</u>

It is understood by the parties that the Court is neither a party to nor bound by this agreement. The Court may accept or reject the agreement, or defer a decision until it has had an opportunity to consider the presentence report prepared by the United States Probation Office. The defendant understands and acknowledges that, although the parties are permitted to make recommendations and present arguments to the Court, the sentence will be determined solely by the Court, with the assistance of the United States Probation Office. Defendant further understands and acknowledges that any discussions between defendant or defendant's attorney and the attorney or other agents for the government regarding any recommendations by the government are not binding on the Court and that, should any recommendations be rejected, defendant will not be permitted to withdraw defendant's plea pursuant to this plea agreement. The government expressly reserves the right to support and defend any decision that the Court may make with regard to the defendant's sentence,

16

Defendant's Initials  <u>KK</u>

whether or not such decision is consistent with the government's recommendations contained herein.

7. Defendant's Waiver of Right to Appeal the Sentence

The defendant agrees that this Court has jurisdiction and authority to impose any sentence up to the statutory maximum and expressly waives the right to appeal defendant's sentence on any ground, including the ground that the Court erred in determining the applicable guidelines range pursuant to the United States Sentencing Guidelines, except (a) the ground that the sentence exceeds the defendant's applicable guidelines range as determined by the Court pursuant to the United States Sentencing Guidelines; (b) the ground that the sentence exceeds the statutory maximum penalty; or (c) the ground that the sentence violates the Eighth Amendment to the Constitution; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), then the defendant is released from his waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

8. Middle District of Florida Agreement

It is further understood that this agreement is limited to the Office of the United States Attorney for the Middle District of Florida and cannot bind other federal, state, or local prosecuting authorities, although this office will bring

Defendant's Initials _KK_

defendant's cooperation, if any, to the attention of other prosecuting officers or others, if requested.

9.    Filing of Agreement

This agreement shall be presented to the Court, in open court or in camera, in whole or in part, upon a showing of good cause, and filed in this cause, at the time of defendant's entry of a plea of guilty pursuant hereto.

10.    Voluntariness

The defendant acknowledges that defendant is entering into this agreement and is pleading guilty freely and voluntarily without reliance upon any discussions between the attorney for the government and the defendant and defendant's attorney and without promise of benefit of any kind (other than the concessions contained herein), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges defendant's understanding of the nature of the offense or offenses to which defendant is pleading guilty and the elements thereof, including the penalties provided by law, and defendant's complete satisfaction with the representation and advice received from defendant's undersigned counsel (if any). The defendant also understands that defendant has the right to plead not guilty or to persist in that plea if it has already been made, and that defendant has the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against defendant, the right against compulsory self-

18

Defendant's Initials _KK_

incrimination, and the right to compulsory process for the attendance of witnesses to testify in defendant's defense; but, by pleading guilty, defendant waives or gives up those rights and there will be no trial. The defendant further understands that if defendant pleads guilty, the Court may ask defendant questions about the offense or offenses to which defendant pleaded, and if defendant answers those questions under oath, on the record, and in the presence of counsel (if any), defendant's answers may later be used against defendant in a prosecution for perjury or false statement. The defendant also understands that defendant will be adjudicated guilty of the offenses to which defendant has pleaded and, if any of such offenses are felonies, may thereby be deprived of certain rights, such as the right to vote, to hold public office, to serve on a jury, or to have possession of firearms.

11.    <u>Factual Basis</u>

Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth in the attached "Factual Basis," which is incorporated herein by reference, are true, and were this case to go to trial, the United States would be able to prove those specific facts and others beyond a reasonable doubt.

12.    <u>Entire Agreement</u>

This plea agreement constitutes the entire agreement between the government and the defendant with respect to the aforementioned guilty plea and no

19

Defendant's Initials  _KK_

other promises, agreements, or representations exist or have been made to the defendant or defendant's attorney with regard to such guilty plea.

13. Certification

The defendant and defendant's counsel certify that this plea agreement has been read in its entirety by (or has been read to) the defendant and that defendant fully understands its terms.

DATED this ~~June~~ 12 day of ~~May~~ June, 2025

_____
Kyle Blake Kotecha
Defendant

_____
Andrew C. Searle
Attorney for Defendant

GREGORY W. KEHOE
United States Attorney

_____
Noah P. Dorman
Assistant United States Attorney

_____
Dana E. Hill
Assistant United States Attorney

_____
Chauncey A. Bratt
Assistant United States Attorney
Deputy Chief, Orlando Division

20

Defendant's Initials _KK_

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                        CASE NO. 6:25-cr-

KYLE BLAKE KOTECHA

PERSONALIZATION OF ELEMENTS

First:       Did two or more persons, in some way or manner, agree to try to
             accomplish a common and unlawful plan to commit wire fraud,
             as charged in the information?

Second:      Did you know the unlawful purpose of the plan and willfully join
             in it?

Third:       During the conspiracy, did you or another conspirator knowingly
             engage in at least one overt act as described in the information?

Fourth:      Was that overt act committed at or about the time alleged and
             with the purpose of carrying out or accomplishing some object of
             the conspiracy?

21

Defendant's Initials   _KK_

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

UNITED STATES OF AMERICA

v.                                          CASE NO. 6:25-cr-

KYLE BLAKE KOTECHA

FACTUAL BASIS

During an investigation into the use of veteran educational benefits, the Department of Veterans Affairs ("VA") Office of Inspector General identified a scheme to engage in prohibited incentive-based recruitment among certain educational institutions. The following reflects true facts about KYLE BLAKE KOTECHA's involvement in that scheme.

**Background**

The Post-9/11 Veterans Educational Assistance Act ("Post-9/11 GI Bill") provides tuition benefits for military veterans who served on or after September 11, 2001. Post-9/11 GI Bill tuition benefits can be used at undergraduate and graduate degree programs as well was non-accredited, for-profit, non-college degree ("NCD") programs. The United States Department of Veterans Affairs ("VA") pays tuition and fees for individuals receiving Post-9/11 GI Bill tuition benefits directly to education providers on the beneficiary's behalf, up to an annual cap.

22

Defendant's Initials _KK_

Once a veteran uses three years of their tuition benefits, they are no longer eligible for Post-9/11 GI Bill tuition benefits.

As part of the Post-9/11 GI Bill, each state was required to designate a "State Approving Agency" ("SAA") to review, approve, and recertify academic institutions and educational programs, including NCDs, to receive Post-9/11 GI Bill tuition benefits. Each academic institution or educational program that receives these benefits funds must designate one or more School Certifying Officials ("SCOs"). These SCOs are responsible for the certification of beneficiaries of Post-9/11 GI Bill tuition benefits and for their school's compliance with VA regulations regarding those benefits.

SAA's periodically audit educational providers and work with SCOs to ensure compliance with VA regulations. When the SAA/VA determines that an institution has violated its rules for funding it will typically "suspend" an educational program while an investigation is conducted. After the investigation has completed, the VA can "withdraw" an educational institution, effectively disqualifying it for VA educational funding.

Under VA funding rules, educational providers are prohibited from engaging in commission-based recruitment to target veterans and their Post-9/11 GI Bill tuition benefits. 38 U.S.C.A. § 3696. In addition, the "85/15 rule" prohibits the payment of Post-9/11 GI Bill tuition benefits to programs where more than 85% of the enrolled

Defendant's Initials _KK_____

student body are veterans.  38 CFR § 21.4201.  Both rules are designed to ensure that veteran educational benefits are paid to bona fide educational programs who provide education benefits generally to a student body that includes veterans rather than programs designed primarily to target and secure VA benefits by targeted recruitment of veterans.

### Established Investments, Inc.

In 2017, KOTECHA created Established Investments, Inc.  Established Investments, Inc. was based in Apopka, Florida, at KOTECHA's residence.  At all relevant times, KOTECHA was the CEO and President of Established Investments, Inc.  Established Investments, Inc. engaged in targeted advertising and marketing to recruit military veterans to attend NCDs.  Established Investments, Inc. conducted business under two names: "Lead Speed" and "Veteran Transition Mission." KOTECHA often conducted business as "Lead Speed" with NCDs to allow NCDs to fraudulently claim they were paying for general advertising and general generation of "leads" of potential students rather than targeting and recruiting veterans.  To the recruits themselves, KOTECHA used the name "Veteran Transition Mission" (VTM) – an entity that per its website appeared to be a non-profit entity committed to helping veterans transition from service.  VTM was registered as a non-profit but was not in fact a non-profit.

24

Defendant's Initials  _KK_

In operating his business, KOTECHA initially used targeted advertisements on social media platforms and search engines so that Veterans Transition Mission would be advertised to veterans. KOTECHA operated this business and developed relationships with multiple NCDs to advertise their programs. Starting in June 2019, however, KOTECHA agreed with NCDs to engage in prohibited commission-based direct recruitment of veterans. KOTECHA, himself and through paid recruiters, identified and contacted veterans, following a script designed to determine their eligibility for Post-9/11 GI Bill tuition benefits. If a veteran was eligible for tuition benefits, KOTECHA enrolled the veteran at an NCD and obtained approximately 25 percent of the tuition collected by the NCD from the VA, which was typically tens of thousands of dollars paid by the VA to the NCD for each veteran. If veterans previously had used their benefits, or were otherwise ineligible, KOTECHA would direct the veterans to an online training program that he ran under the name Kotech Academy, for which he would charge them hundreds of dollars. KOTECHA and his NCD counterparts took steps to conceal the nature of his commission-based recruitment efforts because they knew that it was prohibited and could potentially result in an NCD being withdrawn from VA funding.

**New Horizons Phoenix**

KHAP Inc. d/b/a New Horizons Computer Learning Center of Phoenix ("New Horizons Phoenix") was an NCD based in Phoenix, Arizona that was

Defendant's Initials _KK_

originally approved to receive Post-9/11 GI Bill tuition benefits on March 1, 2012. Zachary Hiscock was the President of New Horizons Phoenix and had submitted documents to the VA certifying that New Horizons Phoenix was not paying commissions or incentives directly or indirectly to recruit veterans in violation of 38 USC § 3696.

On or about January 2, 2019, KOTECHA pitched his plan to recruit veterans to New Horizons Phoenix through targeted online advertising. KOTECHA promised that he would scale New Horizons Phoenix's "VA business" and promised a "turn-key solution that WILL bring veterans, interested in IT careers right to your program." Hiscock responded and, on January 7, 2019, KOTECHA shared an ad copy targeting "Phoenix Veterans" with a "Troops to Tech" program to make them "trained, prepared and certified" in a matter of "weeks."

On February 5, 2019, Hiscock, on behalf of New Horizons Phoenix, signed a Services Agreement retaining Established Investments d/b/a "Lead Speed." The contract stated that Lead Speed offers "lead generation services . . . for the purpose of increasing enrollment of veterans in their educational opportunities." For its services, New Horizons Phoenix agreed to pay Lead Speed a $2,750 a month retainer and cover the costs of the advertising purchases.

From February through May 2019, KOTECHA's online advertising on behalf of New Horizons Phoenix was not effective. In an email interchange in May 2019,

26

Defendant's Initials _KK_

Hiscock relayed that the advertising yielded "zero" new veteran recruits based on the

"leads" that had been identified. In June of 2019, Hiscock proposed that KOTECHA

engage in prohibited commission-based recruiting that they could conceal by using a

special jargon to refer to their activities:

> Here's what I'm thinking . . . completion bonus for each of our
> programs, as follows:
>
> [Table showing courses, with a column "bonus" of $500, totaling $4,000
> at the bottom]
>
> That's our entire Cyber Security Track, it goes for $24,000, commission
> is 16.66%. But we don't call it commission, we call it a completion
> bonus. We draw up the contract so that it is good in terms of how we
> structure this. Basically, you sell 5 students a month, you make
> $20K/month. Once we get 5, we can get a program started. We'll come
> up with some bonuses and stuff as well, but that should give you plenty
> of skin in the game.
>
> I also don't want to pay a management fee anymore. So, what we'll say
> is that I pay you a retainer of $2750 per month, but that pay is all based
> on sales. In fact, I don't even want to pay for the ads that you are
> running, I think we maybe run two separate sets of ads, one for VTM
> [Veterans Transition Mission] and one for NHP [New Horizons
> Phoenix]. Not sure how we work that, but I want your stuff to be
> completely you, that way, I don't have to worry about how it's sold and
> everything else.

By proposing that KOTECHA refer to it as "Premium Lead," Hiscock was proposing

to KOTECHA that they engage in the incentive-based recruitment that both knew

was prohibited by VA rules while obscuring the true nature of KOTECHA's

activities.

27

Defendant's Initials  _KK_

KOTECHA agreed to the plan and immediately started recruiting under the terms that Hiscock proposed. The plan yielded results. On June 10, 2019, KOTECHA emailed Hiscock about individual veterans and whether specific veterans could use Post-9/11 GI Bill tuition benefits. KOTECHA's first email is entitled "Veteran Transition Mission #1" and states "Boom baby! First application. If I had a tie on, I might just have to cut that bad boy." Hiscock responded with the following image from "the Wolf of Wall Street":



On July 8, 2019, KOTECHA emailed a draft contract between his company and New Horizons Phoenix to a third-party seeking advice. In a document entitled "contract notes" provided to this third party, KOTECHA explained that the contract for commission-based recruiting was written to obscure the true nature of the business arrangement in order to evade the VA's commission recruitment prohibition:

The contract is for Zack with New Horizons Phoenix.

28

Defendant's Initials _KK_

This will be similar to a commission agreement, but can not be stated as commission.

The VA doesn't allow for schools to pay commission for veteran enrollments so this will be considered a premium lead.

It will need to state how much will be paid out for each person. This will be based on what they attend . . .

KOTECHA and Hiscock engaged in a series of communications to formalize their arrangement. On July 16, 2019, KOTECHA sent a draft contract that omitted any reference to veterans but noted that Lead Speed would "identify and communicate with prospective students" and would "provide and assist with premium leads." Further, the contract made clear that KOTECHA would be paid for each "premium lead" generated per course:

---

**COMPENSATION**

The Company agrees to pay a monthly fee of $2,500 for digital marketing budget for the first 6 months as well as "Premium Leads." The Contractor will be paid for "premium leads" as stated below:

- → MCSA training $1,100.00
- → Sec+ training $499.00
- → A+ training $800.00
- → Net + training
- → CCENT training $650.00
- → ICND 2 training $650.00
- → IINS training $650.00.

Payment is to be received within ten (10) business days after receipt of any invoice from Contractor in full satisfaction of the balance set forth therein. Contractor agrees to submit appropriate invoices for Services during the prior calendar month by the first (1st) of every subsequent calendar month.

Premium leads are defined as leads that meet an agreed upon threshold as it relates to contractor's leads generated and conversion rate.

---

The "premium leads" table tracked Hiscock's original commission-based proposal that both parties acknowledged could not overtly be called a "commission."

Defendant's Initials  _KK_

Hiscock replied with objections to various terms but did not object to the compensation provisions in this contract. Hiscock and KOTECHA appeared to reach an agreement on terms on or about July 18, 2019, but did not exchange a final signed and countersigned contract. During that time, KOTECHA was targeting veteran students to assess their eligibility for benefits and recruiting them for New Horizons Phoenix. On or about November 18, 2019, KOTECHA sent HISCOCK another draft contract that he described as "just like the one that we did before with updated [termination] dates." Hiscock replied stating "why don't we just do an indefinite (ongoing) contract with cancellation terms as is, that way we don't have to keep sending these out." After this email, KOTECHA and Hiscock stopped negotiating the terms of written contracts. Hiscock continued to pay KOTECHA based on commissions as he had agreed pursuant to the email and draft contracts in June and July 2019.

On December 17, 2019, Hiscock completed an application to maintain his certification to receive VA benefits. In this application, Hiscock falsely certified that New Horizons Phoenix was not engaged in commission-based recruitment of veterans

As a result of Hiscock and KOTECHA's scheme, which began in approximately July 2019, New Horizons Phoenix saw a dramatic increase in enrolled veterans:

30

| Year | Total Enrolled Veterans | Total VA Benefits Received |
|------|-------------------------|----------------------------|
| 2018 | 13 | $64,226.00 |
| 2019 | 58 | $881,641.94 |
| 2020 | 149 | $2,627,117.54 |
| 2021 | 143 | $2,280,224.35 |

Enrollments of veteran students in New Horizons Phoenix sharply rose in July 2019, when KOTECHA started to engage in prohibited commission-based recruiting:

| Year | Total Enrolled Veterans | Total VA Benefits Received |
|------|-------------------------|----------------------------|
| 1/1/2019 to 6/30/2019 | 13 | $150,750.94 |
| 7/1/2019 to 12/31/2019 | 45 | $730,891.00 |

In the course of this scheme, KOTECHA and Hiscock obtained $5,638,232.89 in VA benefits as a result of commission-based recruiting.

Over the course of the relationship, KOTECHA and Hiscock created invoices that concealed the commission-based recruiting that KOTECHA was conducting. From July 2019 through September 2019, KOTECHA's invoices made clear that Lead Speed/Established Investments was being paid a set amount per specific veteran enrolled in the specific class in which they were enrolled. In September 2019, KOTECHA revised his invoices to show that he was being paid per "Premium Lead" associated with specific classes. On January 11, 2020, Hiscock responded to this invoice: "We can't invoice like this anymore…we talked about this." KOTECHA reissued the January 2020 invoice to indicate the amount of money he was being paid per "Premium Lead," without reference to specific classes. In April 2020,

31

Defendant's Initials  _KK_

KOTECHA revised his invoices a fourth time to eliminate all details regarding the payment. KOTECHA and Hiscock's purpose in revising the invoicing was to conceal that KOTECHA was being paid a commission to recruit veterans, in violation of VA regulations.

On December 11, 2020, Hiscock again falsely certified to the VA that New Horizons Phoenix was not engaging in commission-based recruitment.

In February 2021, KOTECHA received a civil investigative demand from the U.S. Attorney's Office referencing, among other things, a violation of the incentive compensation ban by KOTECHA's previous employer. Thereafter, on May 21, 2021, KOTECHA sent a revised contract to Hiscock entitled "Bundled Services Agreement." The "Bundled Service Agreement" falsely set forth that KOTECHA, through his company, would provide various resources such as a "resource kit," "technology services," and "retention services." Neither Hiscock nor KOTECHA had any intention that KOTECHA would provide such services. KOTECHA's purpose in proposing a "Bundled Service Agreement" – in which "technology services" were bundled with recruitment activities – was to obscure the prohibited commission-based recruitment that KOTECHA was conducting. Hiscock did not respond and did not sign this contract.

In August 2021, the Arizona SAA discovered incentive-based recruitment at New Horizons Phoenix during a routine inspection and suspended the program.

32

Defendant's Initials _KK_

During the course of that investigation, Hiscock falsely told the VA SAA that he bought "leads" from KOTECHA via Lead Speed according to a "verbal agreement," paid him on a "pay per lead" basis, and was not targeting veterans – consistent with the fraudulent jargon he had helped to create with KOTECHA two years earlier.

On December 10, 2021, the VA withdrew New Horizons Phoenix's approval to receive Post 9/11 GI Bill tuition benefits based in part on New Horizons Phoenix's relationship with KOTECHA.

**New Horizons St. Louis and New Horizons Computer Learning Center, Illinois.**

Information Solutions Design Incorporated d/b/a New Horizons Computer Learning Center of St. Louis ("New Horizons of St. Louis") was an NCD based in St. Louis, Missouri and was originally approved to receive Post-9/11 GI Bill tuition benefits on April 1, 2013. Information Solutions Design Incorporated also operated an NCD program in Fairview Heights, Illinois doing business under the name New Horizons Computer Learning Center ("New Horizons Illinois"). New Horizons Illinois was originally approved to receive Post-9/11 GI Bill tuition benefits on June 1, 2015. In November 2021, Information Solutions Design Incorporated was dissolved and PATEL and SLATER sought to transfer its authorization for Post-9/11 GI Bill tuition benefits a new corporate entity, Workforce and Technology Training LLC ("Workforce Training Illinois").

Defendant's Initials _KK_

Timothy Slater was the President and owner of New Horizons St. Louis, New Horizons Illinois, and Workforce Training Illinois. Nikhil Patel was the General Manager and SCO of New Horizons of St. Louis, New Horizons Illinois, and Workforce Training Illinois.

In October 2019, Slater engaged KOTECHA to provide targeted online advertising to veterans on behalf of New Horizons of St. Louis. On October 10, 2019, KOTECHA emailed Slater a contract and Slater signed it on the same day (NHSL Contract #1). This contract, concluded between Established Investments, Inc d/b/a/ "Lead Speed" and New Horizons St. Louis, stated that "Lead Speed offers lead generation and conversion services" to NCDs "for the purpose of increasing enrollment of veterans." In November and December 2019, New Horizons St. Louis periodically received automated emails from KOTECHA's company stating, "a new lead was created." Very few veterans were recruited through this process.

In November and December 2019, KOTECHA and Slater exchanged emails changing the nature of their relationship so that KOTECHA would engage in direct, targeted, commission-based recruitment of veterans.

On December 17, 2019, Slater emailed KOTECHA a list of the "VA approved" nine-week instructional program for which the tuition, supplies, and fees would be $21,718, which was close the annual limit per veteran for Post-9/11 GI Bill benefits. Slater said it was designed to "increase the marketability of the

Defendant's Initials  _KK_

veteran/participant." In response, KOTECHA asked "could you give me the price for each class? I essentially take 25% of that and list it for each class so that we can call it a premium lead vs commission. Ps. Tell him [referring to SCO Nikhil Patel] not to worry. We are going to help a lot of people and make a lot of money. ;)" Slater then responded "Looks like the way it breaks down in [sic] $2,180 for the 5 day courses and $1308 for the 3 day ITIL. PS, I like the 'make a lot of money' part 😊." Through these emails, KOTECHA and Slater agreed that KOTECHA would be paid a commission based on each veteran recruited for New Horizons of St. Louis.

On January 3, 2020, KOTECHA emailed a new contract to Slater between New Horizons St. Louis and Established Investments, Inc d/b/a/ "Lead Speed" (NHSL Contract #2). In sending NHSL Contract #2, KOTECHA described it as "the contract that Zack [Hiscock] and I did, minus a bunch of lawyer bs that was in it." The contract specified that "Lead Speed" would recruit students and be paid $603 per week of instruction for each "Premium Lead" and did not mention veterans or recruitment of veterans. The contract was never executed. In KOTECHA's cover email, he stated "our handshake on this deal means more to me than this paper." After this point, Slater and KOTECHA operated under this "handshake" agreement for KOTECHA to engage in commission-based recruitment and veteran enrollments, and tuition benefits significantly increased:

35

| Year | Total Enrolled Veterans | Total VA Benefits Received |
|---|---|---|
| 2018 | 0 | $0 |
| 2019 | 4 | $38,616.68 |
| 2020 | 95 | $1,971,698.24 |
| 2021 | 104 | $2,205,239.22 |

In the course of this scheme, KOTECHA, Slater, and Patel obtained $4,176,937.46 in VA benefits as a result of commission-based recruiting at New Horizons of St. Louis. Slater and KOTECHA's purpose in operating under an informal arrangement was to avoid memorializing in a contract the true nature of the commission-based recruitment in which KOTECHA was engaged.

KOTECHA started invoicing and being paid in accordance with the new commission-based arrangement. His invoices referred to "Premium Leads," using the jargon that KOTECHA had created with Hiscock to obscure the commission-based recruitment of veterans.

On February 26, 2021, after KOTECHA received the USAO's civil investigative demand referenced above, KOTECHA emailed Slater a new contract meant to further obscure the scheme (NHSL Contract #3). The draft was dated February 26, 2021, and referred to Lead Speed as offering "lead generation . . . for the purpose of increasing enrollment of veterans," and purported to charge a $7,000 a month retainer. Slater responded with edits, proposing to among other things change "veterans" to "veterans, WIOA, CARES Act and other targeted customers," backdating the agreement to October 1, 2020, and proposing to reduce the retainer to

36

$5,250. KOTECHA made these changes, inserted an electronic signature, and sent it back to Slater. Slater's purpose in changing the proposed contract was to obscure the veteran-recruitment work that KOTECHA was conducting.

The change in contracts made no difference in the actual business dealings of the parties, and KOTECHA continued to be paid commissions for recruiting veterans in accordance with his January 2020 "handshake deal" with Slater. Slater and New Horizons of St. Louis never paid KOTECHA any monthly "retainer" for either $5,250 or $7,000. Slater did, however, change the method of his payments to KOTECHA, moving from paying directly from a bank account held by New Horizons of St. Louis to payments made via his personal credit cards. In the months immediately after negotiation of NHSL Contract #3, Slater paid KOTECHA as follows:

| Month | Method | Payment |
|---|---|---|
| March 2, 2021 | Wire Payment from New Horizons of St. Louis Bank Account | $10,500.00 |
| May 20, 2021 | SLATER's personal credit card | $47,250.00 |
| June 25, 2021 | SLATER's personal credit card | $84,000.00 |
| July 27, 2021 | SLATER's personal credit card | $78,750.00 |
| July 27, 2021 | SLATER's personal credit card | $30,692.25 |

SLATER's purpose in using, and KOTECHA's purpose in accepting, payments via a personal credit card, rather than New Horizons of St. Louis's bank account, was to avoid documentation of the business arrangement with KOTECHA within the NCD's records and hamper any effort to audit the school.

37

Defendant's Initials _KK_

In March of 2021, Slater and Patel began having KOTECHA recruit veterans to New Horizons Illinois – a second NCD they operated at a different location – to avoid scrutiny about the growth in veteran enrollments at New Horizons St. Louis. Veteran enrollment at New Horizons Illinois (and later Workforce Training Illinois) subsequently increased:

| Year | Total Enrolled Veterans | Total VA Benefits Received |
|------|-------------------------|----------------------------|
| 2020 | 0 | $0 |
| 2021 | 105 | $1,745,589.38 |
| 2022 | 141 | $2,291,173.33 |
| 2023 | 28 | $380,252.00 |

In the course of this scheme, KOTECHA, Slater, and Patel obtained $4,417,014.71 in VA benefits as a result of commission-based recruiting at New Horizons Illinois and Workforce Training Illinois.

In response to the February 2021 civil investigative demand from the U.S. Attorney's Office, on May 10, 2021, KOTECHA sent a "Bundled Services Agreement" to Slater designed to conceal further the true nature of KOTECHA and Slater's business relationship (NHSL Contract #4). Slater did not sign this agreement or respond.

On August 17, 2021, the Missouri SAA contacted New Horizon of St. Louis's SCO, Nikhil Patel about their recruitment practices. Patel falsely represented that all contracts and agreements were focused on "recruitment in general and not specifically veteran students." Patel then listed "multiple sources" of recruitment leads, including

38

Defendant's Initials _KK_

"Lead Speed – 7k per month," and denied having any business relationship with VTM. In reality, Patel and Slater had hundreds of emails with "@veterantransitionmission.org" email addresses over years of business communications. Throughout these dealings, KOTECHA was never paid a $7,000 retainer.

On August 30, 2021, KOTECHA emailed Slater a backdated version of NHSL Contract #4 that he had previously sent on May 21, 2021, entitled "2021 05 09 Revised Bundled Services Agreement". Slater replied with a revised contract and stated that he "took out anything associated with veterans, applications, or enrollments."

On September 2, 2021, just days after Patel told the Missouri SAA that New Horizons of St. Louis had no business relationship with VTM, a New Horizons of St. Louis email contained a calendar invite for a video conference involving numerous individuals with email addresses ending "@veterantransitionmission.org." Patel replied to the emailed invitation on September 2, 2021 – copying Slater and KOTECHA – and asked, "Is there any way to not have these come from a VTM email address or have VTM employee names?"

On September 7, 2021, in response to a request from the Missouri SAA to produce all student recruitment contracts, Patel provided to the Missouri SAA NHSL Contract #3 and the backdated NHSL Contract #4. Patel did not provide NHSL

Contract #1, which explicitly stated that Lead Speed's purpose was to increase veteran enrollments, or NHSL Contract #2, the "handshake" agreement between Slater and KOTECHA on which they had operated commission-based recruitment for years. Slater also falsely denied the commission-based recruitment scheme to the Missouri SAA, stating, on September 30, 2021, that "One of the things we do not do is progressive/commission pay as it relates to compensation for our team that . . . support veterans." Moreover, Slater specifically claimed to be unaware of any veteran recruiting being done by third party vendors retained by New Horizons of St. Louis falsely stating that he was "not aware of any aggressive practices (particularly veterans)."

After this email, the Missouri SAA questioned Patel and Slater regarding the fact that $411,900 of the $418,372.46 of its entire advertising and marketing budget for 2020 was directed to "Lead Speed." The Missouri SAA asked for documentation to support this spending. In response, Slater sent a series of falsified invoices created to conform to the fake contracts and worked with KOTECHA and his employees to generate such false invoices.

On October 4, 2021, the Missouri SAA withdrew New Horizons of St. Louis from receiving Post-9/11 GI Bill tuition benefits because of its violation of the incentive payment prohibition in 38 USC § 3696.

Defendant's Initials _KK_

Despite the withdrawal of New Horizons of St. Louis from receiving Post-9/11 GI Bill tuition benefits, Slater, KOTECHA, and Patel continued operating the commission based recruiting scheme in Illinois. On November 16, 2021, Patel submitted a reapplication to qualify New Horizons Computer Learning Center for VA educational benefits. Among other things, they requested to change the corporate name from New Horizons Computer Learning Center, which was being dissolved, to Workforce and Technology Training LLC ("Workforce Training Illinois"). Patel falsely certified that he was not paying for commission-based recruitment.

On January 6, 2022, KOTECHA incorporated a new entity called "The Reskill Network, Inc." ("Reskill") and decommissioned the VTM webpage, moving his business over to the Reskill.

On January 17, 2022, KOTECHA sent Slater a new version of a contract for services to be used for Workforce Training Illinois. The contract was called the "professional services retainer agreement," and reflected edits to avoid documenting that they planned to continue to do recruitment and enrollment:

Recruitment services Identifying Prospective Students: Company will assist School in identifying ideal candidates for its program. Prospective students will engage Company to learn more about different trade programs. Once a prospective student has been matched with an appropriate program, that student and the student's information will be submitted to School for the School to make an enrollment decision. Company will have no decision making authority whether a student is enrolled in School's program. If the student is accepted, a Company representative will work with the student to ensure that the student has all of their paperwork prepared and pre-course work completed. and are prepared for enrollment.

Commented [8]: I kinda want to stay away from this word.

Commented [GG9R8]: 10-4

41

Defendant's Initials _KK_

Beginning in February 2022, KOTECHA and Slater agreed to a $95,000 a

month "retainer" for his services.  Although the payment was styled as a retainer, in

reality it was based on KOTECHA's recruitment of veterans and enrollments.

KOTECHA made this clear in negotiating the retainer:

| From: | Local Device <db-f30e483ce16b368139025f057b19feb4> |
| To: | "+1 618-741-2924" |
| Date: | Wed, 26 Jan 2022 16:39:30 -0500 |

Hey, just wanted to update you and hopefully save you some time as well.

Nikhil gave me contract changes and I will be working those in tonight and sending to you guys to sign via hellosign.

Based on what we have done in Jan and what we will do in feb, here is the math I have for payment. Realistically we will do about 114 students plus in this 6 month window. If we only did 15 students per month, that would be 90 in the six months. By end of feb we would already be over half way there with 50 plus.

114 is shooting low, but I would rather be low on my end than what we give you. That would be about 100k per month.

Let's do 95k per month and subtract the salary. That would leave us close to 90k per month.

I'm shooting lower because we will have to start selling in person towards the end of that term.

Give me the thumbs up, and I will get all of this done and over to you and Nikhil.

Thanks,
Kyle

In a follow-up text, KOTECHA also explained that they had come up with a new

disguise for their prohibited activity:

2022-02-04 16:23:32 UTC <Local Device <DB-f30e483ce16b368139025f057b19feb4>>: Lastly, we came up with a new name for what we send you. Pre enrollment referrals.

Despite this prohibited arrangement, Patel falsely represented to the Illinois

SAA that Workforce Training Illinois was not affiliated with KOTECHA's newly

branded operation:

42

Defendant's Initials *KK*

> 3.) On question 10 – you stated in your response "We used their affiliate (LeadSpeed) to generate leads as we do with other agencies." Please send me a list of other agencies that generate leads for your facility that you have agreements with. Also, please describe the nature of the agreement you have with these other agencies.
> Response: Here are a list of all sources from which ECs can get leads: Facebook, Workforce Agencies, Atlas, Indeed, ZipRecruiter (terminated), Careerbuilder, Reachlocal, LeadSpeed (terminated), Lead & Data Inc (terminated), our website (career training pages) and monthly webinars. In each case either our Education Consultants (ECs) search an online database for leads or leads are referred into our CRM using a web-form.

Slater, Patel, and KOTECHA continued to operate the prohibited commission-based recruiting until the execution of a search warrant at KOTECHA's business/home in January of 2023.

### Global Institute of Technology Services

Global Institute of Technology Services was an NCD program operating in Richmond, Virginia and originally approved to receive Post-9/11 GI Bill tuition benefits on August 24, 2015. Ganghadar Bathula was the owner, operator, Program Director and SCO for Global Institute of Technology Services. In Global Institute of Technology Services' initial approval process and in reapprovals thereafter, it was required to acknowledge that it was not paying a commission or incentive fee to recruit veterans in violation of 38 USC § 3696.

In April 2019, KOTECHA pitched his recruiting business to Bathula for Global Institute of Technology Services. KOTECHA made it clear that his business was focused on recruiting veterans and securing VA benefits and KOTECHA said he would start working for Global Institute of Technology Services at a discounted rate, with the understanding that "when you love our work and get VA approval for your programs, you are willing to move to our normal rate."

43

Defendant's Initials _KK_

On August 26, 2019, the Virginia Department of Veterans Services wrote a letter to Bathula approving certain courses to receive Post-9/11 GI Bill tuition benefits.  On September 4, 2019, Bathula responded to KOTECHA's April 2019 email forwarding this approval letter and stated that he had received approval and wanted to "develop a strategy to enroll students into our programs."  On September 5, 2019, KOTECHA responded "We have gotten even better at our craft. I'm working with one center where we generate the leads and handle the enrollments. We did 414k in the first month." KOTECHA then followed up with an email encouraging Bathula to hire him by stating that "the addition of VA approval could result in millions in additional revenue per year for your school."

In January 2020, Bathula started asking questions about the lawfulness of KOTECHA's recruiting business to one of KOTECHA's employees.  KOTECHA emailed in response "[The employee] did mention that you were concerned about paying us based on VA regulations. We are a marketing firm and we charge you for a premium lead. This is completely fine with the VA as they do not dictate how much you can spend on marketing costs."  When Bathula responded referring to the payments to KOTECHA as a "commission," KOTECHA responded "Hi Ganga, It's not considered a commission. We charge a premium lead cost. I said a % because it is easier to understand that way."  In these emails, KOTECHA was explaining to Bathula how they would need to refer to their prohibited arrangement by using coded

44

Defendant's Initials  _KK_

language to conceal the prohibited commission-based recruiting KOTECHA would employ and to make the millions in revenue KOTECHA had promised.

On June 30, 2020, Bathula emailed a signed contract between Global Institute of Technology Services and Established Investments Inc. d/b/a Lead Speed or Leadspeed to KOTECHA that KOTECHA signed and returned. The contract states that Leadspeed would be paid a percentage of the veteran educational benefits that it secured for Global Institute of Technology Services:

1. **SERVICES.**

   a   Company hereby engages Leadspeed to provide Company with Premium Leads. The Standards shall be specified in writing, and may be modified from time to time, by Company to Leadspeed; provided, however, if no such writing has been provided by Company to Leadspeed, Leadspeed shall use its reasonable judgment in evaluating and submitting such individuals as Premium Leads to Company (collectively, the "Services").

2. **COMPENSATION.**

   a   Company shall compensate Leadspeed for the Services by paying to Leadspeed Twenty Five Percent (25%) of all Tuition received by Company ("Lead Fees").

KOTECHA's subsequent invoices also made clear the nature of the commission-based recruitment by listing each payment per veteran recruited. The contract did not explicitly specify recruitment of veterans and instead defined a "premium lead" as one that Lead Speed has "interviewed and prequalified based on the qualities, characteristics, and standards desired by" Global Institute of Technology Services. In fact, KOTECHA and Bathula both knew that this arrangement was for recruiting

45

Defendant's Initials   *KK*

veterans. After signing this agreement, KOTECHA engaged in commission-based recruitment of veterans and Global Institute of Technology Services dramatically increased its enrollments of veterans:

| Year | Total Enrolled Veterans | Total VA Benefits Received |
|------|-------------------------|----------------------------|
| 2018 | 0 | $0 |
| 2019 | 0 | $0 |
| 2020 | 70 | $806,792.07 |
| 2021 | 171 | $2,181,755.56 |

In the course of this scheme, KOTECHA and Bathula obtained $2,988,548 in VA benefits as a result of commission-based recruiting at New Horizons Illinois and Workforce Training Illinois.

In response to the February 2021 civil investigative demand from the U.S. Attorney's Office, on May 10, 2021, KOTECHA sent a "Bundled Services Agreement" to Bathula to obscure the commission-based recruitment scheme. Bathula did not sign that contract or respond.

On July 9, 2021, in an application for approval, Bathula falsely attested that he was not targeting veterans for recruitment. On August 20, 2021, Bathula obtained reapproval for VA benefits from the VA SAA. However, Bathula did not disclose his relationship with KOTECHA.

Defendant's Initials _KK_

On December 31, 2021, the Virginia SAA contacted Bathula telephonically regarding the use of recruiters.  During the call, Bathula falsely stated he did not use recruiters.

During a January 2022 compliance visit, student interviews revealed that GIT was using KOTECHA as a recruiter.  Bathula then disclosed its contract with Lead Speed to the Virginia SAA.

On February 2, 2022, Bathula sent KOTECHA a text message in which he stated that the Virginia SAA came to know of their arrangement because "one student informed about VTM enrollment into GIT" and that the Virginia SAA was asking about "total number of student enrollments.  If you have time we can have a brief zoom call this evening  Let me know best time I need to respond quickly Thanks Ganga".

On February 2, 2022, Bathula emailed a cancellation letter to KOTECHA backdated to September 6, 2021.  The purpose of this letter was to falsely document that Bathula had discontinued the relationship with KOTECHA before the Virginia SAA had discovered it.  In the cover email to KOTECHA, Bathula forwarded some of the questions being asked by the VA SAA, inviting KOTECHA to help him craft a response.

On April 30, 2022, Global Institute of Technology Services was withdrawn from the VA program.

47

Defendant's Initials _KK_

**ABCO Technology**

ABCO Technology was an NCD program operating in Los Angeles, California and was originally approved to receive Post-9/11 GI Bill tuition benefits on December 1, 2012. Arif Hassan Sayed was the owner, CEO, and school director of ABCO Technology. In the course of maintaining ABCO Technology's approval to maintain VA funding, Sayed submitted documents to the VA certifying that the company was not paying commissions or incentives directly or indirectly to recruit veterans in violation of 38 USC § 3696.

In May of 2019, Sayed retained KOTECHA to engage in targeted advertising of veterans for ABCO Technology. The initial contract suggested that KOTECHA would be obtaining "Leads" and paid KOTECHA $3,000 a month for this service. In August of 2019, Sayed and ABCO increased KOTECHA's monthly retainer to $3,500.

Beginning in July 2019, KOTECHA started pressing Sayed to engage in commission-based recruiting. On July 26, 2019, KOTECHA emailed Sayed in an email entitled "Game Plan" in which he proposed increasing the price of the course to receive additional VA funding and increasing the class size to increase margins.

On March 17, 2020, KOTECHA sent an email to Sayed, laying out the commission-based recruiting business plan going forward and attaching a contract.

48

Defendant's Initials _KK_

The contract set forth that KOTECHA would be paid 40% of the tuition received by

ABCO:

> **2. COMPENSATION.**
>
>   a. Company shall compensate Leadspeed for the Services by paying to Leadspeed Forty percent (40%) of all Tuition received by Company ("Lead Fees").
>   b. Lead Fees shall be invoiced at the start of each Class for Tuition paid by all Students in the respective Class; and payable by the Company not more than Thirty (30) days after the date of invoice.  Example: total program cost is 10,000 for a completed student and Leadspeed will be paid $4,000 per completed student. We will invoice once per week $307.69 per student still enrolled in class. This fee will be payable net 25. When the price of the program increases, the amount will increase accordingly.

On March 17, 2020, KOTECHA emailed an ABCO employee and stated that

Sayed instructed him to "work directly with you on enrolling veteran students into the

online program"; they made arrangements to talk by phone.

On June 1, 2020, KOTECHA emailed Sayed and stated, "I wanted to see if

you're still working on getting the program pricing approved that would allow us to

consistently send people to you?"  Sayed responded by agreeing to KOTECHA's

proposal: "I'm working on a plan for the price.  Can we agree to $4000 a pop."

KOTECHA then responded "4k per person for the new program we are working on

or for the overflow," referring to their existing relationship, and then stated that "I

would meet you in the middle."

On May 10, 2021, KOTECHA sent a "Bundled Services Agreement" to Sayed

designed to conceal the true nature of the commission based recruiting scheme.

Sayed did not sign this contract.

Defendant's Initials _KK_

On May 17, 2021, an ABCO employee emailed KOTECHA the terms of compensation that Sayed and KOTECHA had orally discussed in April 2021:

> I am sending this email as to recap the meeting you both held at the end of April to discuss the billing for students.
> I have outlined the billing schedule that was agreed upon and we will continue to follow –
>
> 1) 1st Invoice - $1500 per student after 20 days of enrollment.
>
> 2) 2nd Invoice - $1000 per student after 60 days of successful attendance
>
> 3) 3rd & Final Invoice - $1500 per student after 120 days of successful attendance

KOTECHA and Sayed's purpose in making an oral, non-documented agreement was to avoid documenting KOTECHA's engagement in commission-based recruiting.

Subsequent ABCO invoices made clear that KOTECHA was being paid per recruited student. Prior to June 2021, ABCO Technologies would invoice KOTECHA monthly for $3,000 or $3,500. However, beginning in June 2021, invoices for KOTECHA's commission listed the specific veterans by name who were recruited and the payment per veteran. KOTECHA's scheme resulted in increased veteran enrollments and tuition benefits received:

| Year | Total Enrolled Veterans Through Per-Student Fee Structure | Total VA Benefits Received |
|------|------|------|
| 2021 | 117 | $1,406,777.70 |
| 2022 | 47 | $604,881.17 |

Defendant's Initials  *KK*

In the course of this scheme, KOTECHA and Sayed obtained $2,011,658.87 in VA benefits as a result of commission-based recruiting at ABCO Technology.

On January 11, 2022, Sayed emailed KOTECHA and others, reiterating their oral agreement:

> We are going to sort your invoices and pay them according to our agreement back in April. Here is the breakdown from that email and our discussion:
>
> 1) $1500 per student after 20 days of enrollment. This will also make sure that his students continue to attend classes and they don't drop.
>
> 2) $1000 per student after 60 days of successful attendance
>
> 3)Final $1500 per student after 120 days of successful attendance - This will also make sure that his students continue to attend classes and they don't drop.
>
> Please do not mark invoices for students before the agreed upon schedule. It will only create confusion for all of us. There is a reason that this schedule was established and agreed upon. If anyone has any questions, please reach out to me.

At the same time, on March 9, 2022, Sayed signed a reapplication for ABCO Technology, and falsely represented that he was not engaged in commission-based recruiting.

## Interstate Wires and Loss

In all of the above conduct, KOTECHA worked with others to accomplish a shared and unlawful plan to engage in a scheme to defraud, using interstate wires. KOTECHA knew of the unlawful plan and willfully joined in it and knowingly

Defendant's Initials _KK_

engaged in multiple overt acts for the purpose of carrying out the objective of the conspiracy. Throughout this conduct, KOTECHA operated Established Investments, Inc. from his home in Apopka, Florida and communicated with conspirators and engaged in financial transactions while in the Middle District of Florida.

In furtherance of the conspiracy, and to effectuate the objects thereof, the following overt acts, among others, were committed in the Middle District of Florida:

      a.     On or about February 11, 2020, HISCOCK and New Horizons Phoenix transmitted $29,760.55 via interstate wire to a Wells Fargo Account ending in 9734 for KOTECHA invoices 24F2F3C-0046 and 24F2F3C-0047 for prohibited commission-based recruitment.

      b.     On or about May 5, 2020, HISCOCK and New Horizons Phoenix transmitted $15,535.70 via interstate wire to a Wells Fargo Account ending in 9734 for KOTECHA invoice 8437F27C-0004 for prohibited commission-based recruitment.

      c.     On or about December 28, 2020, BATHULA and Global Institute of Technology Services transmitted $5,450 via interstate wire to a Wells Fargo Account ending in 9734 for KOTECHA invoice 100-255 for prohibited commission-based recruitment.

      d.     On or about April 21, 2021, SLATER, PATEL, and New Horizons of St. Louis transmitted $47,250 via an interstate wire to Wells Fargo

Defendant's Initials _KK_

Account ending in 9734 for KOTECHA invoice 100-319 for prohibited commission-based recruitment.

    e.    On or about August 30, 2021, SLATER, PATEL, and New Horizons of St. Louis transmitted $78,750 via interstate wire to a Wells Fargo Account ending in 9734 for KOTECHA invoice 10-337-30 for prohibited commission-based recruitment.

    f.    On or about October 1, 2021, SAYED and ABCO Technology transmitted $36,540 via interstate wire to a Wells Fargo Account ending in 9734 for KOTECHA invoice 10-337-67 for prohibited commission-based recruitment.

    g.    On or about October 18, 2021, SAYED and ABCO Technology transmitted $24,000 via interstate wire to a Wells Fargo Account ending in 9734 for KOTECHA invoice 10-337-67 for prohibited commission-based recruitment.

    h.    On or about November 17, 2021, BATHULA and Global Institute of Technology Services transmitted $17,165 via interstate wire to a Wells Fargo Account ending in 9734 for KOTECHA invoice 10-337-90 through 10-337-97 for prohibited commission-based recruitment.

    i.    On or about February 14, 2022, SLATER, PATEL, and Workforce Training Illinois transmitted $85,000 via interstate wire to a Bank of America Account ending in 4353 for KOTECHA invoice 1001 for prohibited commission-based recruitment.

53

Defendant's Initials   _KK_

j.      On or about February 14, 2022, SLATER, PATEL, and Workforce Training Illinois transmitted $85,000 via interstate wire to a Bank of America Account ending in 4353 for KOTECHA invoice 1002 for prohibited commission-based recruitment.

As a result of KOTECHA's scheme, KOTECHA and his Co-Conspirators unlawfully received millions of dollars from the VA, including:

| Defendants | Institution | VA Benefits Received |
|---|---|---|
| KOTECHA, Hiscock | New Horizons Phoenix | $5,638,232 |
| KOTECHA, Slater, Patel | New Horizons of St. Louis Workforce Training Illinois | $8,593,952 |
| KOTECHA, Bathula | Global Institute of Technology Services | $2,988,548 |
| KOTECHA, Sayed | ABCO Technology | $2,011,658 |
| Total | | $19,232,390 |

Based on banking records, the parties agree that the best estimate of the proceeds KOTECHA personally obtained from the charged conspirators was approximately $3,965,264.35. Those funds KOTECHA personally obtained from the conspiracy were deposited into the following accounts:

a.  Wells Fargo Bank Account #5277099734 held in the name of Established Investments, Inc.;

b.  Wells Fargo Bank Account #1010310175889 held in the name of Kyle Kotecha;

c.  Bank of America Account #898130334353 held in the name of The Reskill Network, Inc.; and

54

Defendant's Initials   _KK_

   d.  Bank of America Account #898132432295 held in the name of KKSKK Real Estate Holdings, LLC.

Therefore, KOTECHA admits that the funds sought for forfeiture from these accounts constitute proceeds he personally obtained from the wire fraud conspiracy.

     The above is merely a summary of some of the events, some of the persons involved, and other information relating to this case. It does not include, nor is it intended to include, all the events, persons involved, or other information relating to this case.

**Signature:** *Kyle Kotecha*
Kyle Kotecha (Jun 27, 2025 11:53 EDT)

**Email:** kyle@leadlabsplus.com

55

**Defendant's Initials** _KK_